# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION



GEORGE NAFZIGER and    *
JANICE NAFZIGER
6035 Ash Hill Court    *
West Chester, OH 45069

and    *



RICK CHRISTOPHER and    *
SHERRY CHRISTOPHER
2701 Millbridge Court    *
Dayton, OH 45440-2225

and    *

MARK BECKER and    *
DENISE BECKER
230 Ridgecrest Drive    *
Dayton, OH 45416

   *

ELIAS SPYROU and    *
KATHY SPYROU
856 Princewood Avenue    *
Dayton, OH 45429-5624

and    *

JAMES ENGLAND and    *
DONNA ENGLAND
1025 Lipton Lane    *
Beavercreek, OH 45430-1313

   *

and    *

CYNTHIA EBY    *
306 Estonia Drive
New Lebanon, OH 45345-1312

   *

and    *

CARLA JENDREK    *
285 Raymond Drive
Monroe, OH 45050-1618    *

   *

and

CASE NO.

# C-1-03    377

### COMPLAINT WITH JURY DEMAND



1

CAROLE ROBINSON-BURKS and      *
ROBERT BURKS      *
3433 Harberer Avenue
Dayton, OH 45408      *

  and      *

H. KAY HURSTON      *
11275 Friend Rd.
Germantown, OH 45327      *

  and      *

ALBERT GIBSON and      *
JEANETTE GIBSON
2750 Soldiers Home-West Carrollton Rd.      *
Dayton, OH 45418
     *

  and      *

     *
JOSEPHINE WATSON
4041 Prescott Avenue      *
Dayton, OH 45406
     *

  and      *

     *
SHIRLEY BARKER and
MICHAEL BARKER      *
8253 Meadowlark Drive
Carlisle, OH 45005      *

  and      *

JAMES McKNIGHT and      *
CLARA McKNIGHT
170 Redbud Drive      *
Springboro, OH 45066
     *

  and      *

     *
JOHN BRUNO
141 Sunnyridge Lane      *
Dayton, OH 45429
     *

  and      *

CHERYL APPLEGATE and



BRANNON & ASSOCIATES • 124 East Third Street, Suite 403 • Dayton, OH 45402

RONALD APPLEGATE                    *
44548 Moss Oak Trail
Bellbrook, OH 45305                 *

    and                            *

JERRY KOONS and                     *
ELIZABETH KOONS
2527 Cinnamon Ridge Court           *
Miamisburg, OH 45342
                                    *
    and
                                    *
DEBBIE COONS and
GARY COONS                          *
155 Elinor Drive
Springboro, OH 45066                *

    and                            *

PAUL WEINMAN and                    *
NANCY WEINMAN
701 Golden Arrow court              *
Miamisburg, OH 45342
                                    *
    and
                                    *
TIM TAYSE and
MARY TAYSE                          *
321 Welcome Way
Carlisle, OH 45005                  *

    and                            *

CAROLYN ANDREWS                     *
1185 Bournemouth Court
Centerville, OH 45459               *

    and                            *

GAYLE JEWETT                        *
10204 Forestedge Lane
Miamisburg, OH 45342                *

    and                            *



WARREN BOWLING and           *
EVELYN BOWLING
6110 Hursh Rd.           *
Middletown, OH 45042
          *
and
          *
LARRY LAMSA and
HOLLY DODGE LAMSA           *
32 Timber Ridge
Los Alamos, New Mexico 87544           *

and           *

LINDA HASTINGS and           *
TERRENCE HASTINGS
110 S. River Street           *
Franklin, OH 45005
          *
and
          *
DEBORAH WITTENHAGEN and
ROBERT HAGEN           *
330 Janet Avenue
Carlisle, OH 45005           *

and           *

PAULA NIEBAL and           *
VAN NIEBAL
1895 W. Alex-Bell Rd.           *
Dayton, OH 45459
          *
and
          *
TIERESA FOX and
JAMES FOX           *
8265 Germantown, OH 45327
          *
       Plaintiffs.
          *
v.
          *
MCDERMOTT INTERNATIONAL, INC.
1450 Polydras Street           *
P.O. Box 61038
New Orleans, LA 70161-1038           *



and                                          *

MCDERMOTT INCORPORATED          *
1450 Polydras Street
P.O. Box 61038                               *
New Orleans, LA 70161-1038

                                             *
and
                                             *
BWX TECHNOLOGIES
Rte. 726 Mt. Athos Rd.                       *
P.O. Box 11165
Lynchburg, VA 24506                          *

and                                          *

BWXT FEDERAL SERVICES, INC.     *
Rte. 726 Mt. Athos Rd.
P.O. Box 11165                               *
Lynchburg, VA 24506
                                             *
and
                                             *
BWXT OF OHIO, INC.
Rte. 726 Mt. Athos Rd.                       *
P.O. Box 11165
Lynchburg, VA 24506                          *

and                                          *

JOHN FEES                                    *
Rte. 726 Mt. Athos Rd.
P.O. Box 11165                               *
Lynchburg, VA 24506
                                             *
and
                                             *
PEYTON (SANDY) BAKER
Rte. 726 Mt. Athos Rd.                       *
P.O. Box 11165
Lynchburg, VA 24506                          *

and                                          *

                                             *



RICH HIGGINS                                    *
Rte. 726 Mt. Athos Rd.
P.O. Box 11165                                  *
Lynchburg, VA 24506
                                                *
    and
                                                *
JOHN HOVINGO
Rte. 726 Mt. Athos Rd.                          *
P.O. Box 11165
Lynchburg, VA 24506                             *

    and                                         *

ROBERT A. BERGIN                                *
Rte. 726 Mt. Athos Rd.
P.O. Box 11165                                  *
Lynchburg, VA 24506
                                                *
    and
                                                *
ALL OTHER JANE OR JOHN DOES,
who either as corporations, business            *
associations, sole proprietorships,
individuals, agents or employees thereof,       *
whose names are unknown but shall be
ascertained through discovery, are              *
necessary and proper parties to this action.
                                                *
        Defendants.

_____

Now come Plaintiffs, by their undersigned attorneys, and respectfully allege as follows.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over the causes of action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. § 2210 (n) (2), 18 U.S.C. § 191, 29 U.S.C. § 2102, 29 U.S.C. § 1140. This Court also has jurisdiction over this civil suit pursuit to 28 U.S.C. 1332 (diversity jurisdiction). This Court also has pendant jurisdiction and/or supplemental jurisdiction over any state cause of action alleged herein.

## PARTIES

2.    George Nafziger, James McKnight, Mark Becker, James England, Elias Spyrou, Rick Christopher, Cynthia Eby, Carla Jendrek, Carole Robinson-Burks, Albert Gibson, H. Kay Hurston, John Bruno, Linda Hastings, Deborah Witten-Hagen, Cheryl Applegate, Paula Niebal, Teresa Fox, Shirley



Barker, Debbie Coons, Josephine Watson, Warren Bowling, Jerry Koons, Larry Lamsa, Carolyn Andrews, Tim Tayse, Gayle Jewett, and Paul Weinman are employees at the Mound Facility in Miamisburg, Ohio, who were part of the involuntary separation plan (hereinafter "ISP") of June 26, 2001. They will be referred to collectively as "Plaintiffs" or "Cold War Plaintiffs."

3. Janice Nafziger, Clara McKnight, Denise Becker, Donna England, Kathy Spyrou, Sherry Christopher, Robert Burks, Jeanette Gibson, Terrence Hastings, Robert Hagen, Ronald Applegate, Van Niebal, James Fox, Michael Barker, Evelyn Bowling, Elizabeth Koons, Holly Dodge Lamsa, Mary Tayse, and Nancy Weinman are spouses of the respective Cold War Plaintiffs and bring separate actions for loss of consortium. These Plaintiffs will be collectively referred to as "Spousal Plaintiffs."

4. Defendant McDermott International, Inc. is a Panamanian Corporation whose principal place of business and corporate headquarters is in New Orleans Louisiana. McDermott is the parent company of the McDermott group of companies, which includes, but is not limited to, all the corporate Defendants in this lawsuit.

5. Defendant McDermott Incorporated is a Delaware Corporation and a subsidiary of Defendant McDermott International Inc. (hereinafter both corporations will be collectively referred to as McDermott unless otherwise specified in this Complaint) and is the parent corporation of all the corporate Defendants in this lawsuit with the exception of McDermott International, Inc.

6. Defendant BWX Technologies is a Delaware Corporation whose principal place of business and headquarters is in Lynchburg, Virginia. BWX Technologies is a subsidiary corporation of McDermott International and McDermott Incorporated and Babcock & Wilcox Investment Company.

7. BWXT Federal Services, Inc. is a Delaware Corporation whose principal place of business and headquarters is in Lynchburg, Virginia. BWXT Federal Services, Inc. was previously known as Babcock & Wilcox Federal Services (hereinafter collectively as BWFS). BWFS is a subsidiary corporation of BWX Technologies (hereinafter all three corporations will be collectively referred to as BWXT unless otherwise specifically noted) and Babcock & Wilcox Investment Company, McDermott Incorporated and McDermott International.

8. BWXT of Ohio, Inc., formerly known as Babcock & Wilcox of Ohio, Inc., (and also known as BWO Inc.) (hereinafter collectively referred to as BWXTO) is a Delaware Corporation whose principal place of business and headquarters is in Lynchburg, VA. BWXTO is the subsidiary corporation of BWXT and McDermott.

9. Defendant John Fees ("Fees") is being sued individually and in his capacity as President, BWXT, during the years of approximately 1997 – 2001, and is also being sued in the capacity relating to any other positions he held within the McDermott family of companies that are identified, directly or indirectly, in this lawsuit for the years 1996 to date.

10. Defendant Peyton (Sandy) Baker ("Baker") is being sued individually and in his capacity as Site Manager at the Mound facility during the years of approximately 1998 – 2001, and is also being sued in the capacity relating to any other positions he held within the McDermott family of companies that are identified or referred to, directly or indirectly, in this lawsuit for the years 1996 to date.



**BRANNON & ASSOCIATES** • 124 East Third Street, Suite 403 • Dayton, OH 45402

7

11. Defendant Rich Higgins is being sued individually and in his capacity as an officer and/or supervisor of BWXTO and/or BWXT.

12. Defendant John Hovingo is being sued individually and in his capacity as an officer and/or supervisor of BWXTO and/or BWXT.

13. Other Defendants, Defendants, Jane and/or John Does, are entities who either as corporations, business associations, sole proprietors, individuals, agents or employees thereof, whose names are unknown but shall be ascertained through discovery, and either responsible for the injuries suffered by Plaintiffs and/or were/are agents, employees and/or servants of any of the other Defendants and/or otherwise held positions within the McDermott family of companies that are identified or referred to, directly or indirectly, in this lawsuit for the years 1996 to date and/or provided any type of insurance coverage under which Plaintiffs were covered at the time.

## GENERAL ALLEGATIONS

### BACKROUND ALLEGATIONS

14. Cold War Plaintiffs bring this action for three (3) distinct groups of violations of their rights:

15. The first group of violations occurred before the June 26, 2001, Involuntary Separation Plan ("ISP"), but after Defendants BWXT and BWXTO assumed responsibilities under the general contract awarded by DOE for cleanup or remediation of the federal superfund site at the Mound Facility in Miamisburg, Ohio. These violations are alleged to be in the nature of contract/estoppel, discrimination (continuing), retaliation, and tort. Though many of these violations are collective to all Cold War Plaintiffs (and therefore, all persons working at the Mound Facility) or specific subgroups of Cold War Plaintiffs (e.g. women, Blacks, handicapped); many of the causes of action and facts are individual in nature owning to specific facts unique to the individual Cold War Plaintiff.

16. The second group of violations occurred during the ISP process. These alleged violations are in the nature of contract/estoppel, discrimination, retaliation, and tort. Though many of these violations are collective to all Cold War Plaintiffs (and therefore, all persons who were part of the ISP) or specific subgroups; many of the allegations are individual in nature owning to the specific facts unique to the individual Cold War Plaintiff.

17. The third group of violations occurred after the ISP process. This third group of violations is in the nature of contract/estoppel, discrimination, retaliation, and tort. As before, many of the allegations can be viewed collectively as violations against all persons subject to the ISP or to various subgroups of ISP workers, many of the allegations and facts are individual in nature.

18. All Cold War Plaintiffs had a "Q" clearance security rating at the time of the ISP and/or in the past and/or were eligible to have "Q" clearance, which is the highest security rating at the Mound Facility.

19. Unless otherwise indicated, each of the Plaintiffs was placed in a position under general contractor BWXT/BWXTO, in September 1997, and placed in and/or assigned to the same functional role they were performing prior to BWXT/BWXTO assuming the general contract.



20.     Defendant McDermott wholly owns a group of subsidiary corporations, including all the corporate Defendants in this lawsuit, over which McDermott exercises dominion and control, such that these subsidiaries are mere instrumentalities of the parent, McDermott.

21.     McDermott's control was, throughout the events at issue in this lawsuit, especially prominent in the areas of corporate policy and employee relations, personnel policies and practices, inter- and intra-management relations, company benefits, thrift plan, health insurance, disability and disability insurance, long term disability and long term disability insurance, accidental death, or dismemberment insurance, pension, and other matters.  Further, neither BWXTO nor BWFS nor BWXT is sufficiently capitalized to pay damages in this lawsuit.

22.     As a practical matter, the intra-corporate structure of the McDermott family of companies was such that their management, upper management, and executives of the subsidiary corporations reported to parent corporations, including McDermott, upon all operations including, but not limited to, day to day operations. Comparable job titles between the corporate entities are not equal in that an executive in a subsidiary corporation would routinely answer to and be considered beneath a comparable executive position in any of the parent corporations. Additionally, it is a common practice for management and executive level employees to transfer between the various corporate entities as if they were one corporation. When a management level employee fell into disfavor at one of the corporate entities it is common practice for a position of equal or greater pay and comparable status to be found, or created, for that employee at one of the other corporate entities.

23.     Control over the subsidiary corporations by McDermott is so complete that the subsidiary corporations have no separate functions, will, or existence, of its own and control over the subsidiary corporations was exercised in such a manner as to commit fraud and/or an illegal act against Plaintiffs and injury resulted to Plaintiffs from such control and/or wrong conduct.[1]

## BACKGROUND HISTORY OF THE MISSION OF MOUND FACILITY AND ITS IMPACT ON ITS WORKERS

24.     The Mound Facility is currently a superfund clean-up site funded by U.S. taxpayers through the federal government.  By way of background, the origin of Mound Facility begins in World War II and the Manhattan Project. Monsanto was contacted by the U.S. government and asked to support its nuclear weapons program. Operations began at the Monsanto Facility on Nicholas Road, in Dayton, Ohio and after operations in five other sites; a permanent home was established in Miamisburg, at the site known today as Mound. The Mound Facility began operations on or about January 1949.

25.     The work undertaken at the Mound Facility initially revolved around the production of highly radioactive "neutron emitters", which was critical for the US nuclear weapons project in the initiation of the thermo-nuclear reaction. To this end, a number of other elements were studied, all of which had the common characteristic of being a high neutron emitter (i.e. highly radioactive), and, subsequently, highly dangerous to human life.

---

[1] Eg. *Belvedere Condo. Unit Owners' Assn. v. R.E. Roark Cos. Inc.* (1993), 67 Ohio St.3d 274.



**BRANNON & ASSOCIATES** • 124 East Third Street, Suite 403 • Dayton, OH 45402

26.     With the onset of the Cold War, Mound's mission was vital for the national defense. The Federal government's financial investment for building the Mound facility was huge for the time. One building, T-Building, was a concrete bunker, which extends five stories into the ground. When finished, this bunker would house a complete production line and machine shop for the assembly of the critical initiators for American's nuclear weapons.

27.     Over the years, Mound assembled one of the finest research laboratories in the world and its machine shop was exceptional. The training and education provided to both degreed and non-degreed employees was exceptional and superior to many college courses.

28.     As a result of close working associations with highly educated persons coupled with detailed and thorough educational training classes and work experience, many of the employees had knowledge greater than many persons graduating college, even with degrees in specialized areas. For example, Plaintiff Gayle Jewett was assigned for a number of years to the important cleanup task of identifying the chemical makeup of unknown substances. This required knowledge to identify hundreds of different chemicals, many very hazardous to human life and often radioactive. Because of her skill and knowledge, Ms. Jewett continued in this area of work as others were transferred out as volume decreased. Ms. Jewett has no degree beyond a high school education.

29.     Mound was not solely dedicated to the production of radioactive weapons components. It had an extensive production facility focused on the production, testing, and long-term analysis of detonators and other explosive devices used in nuclear weapons, which required the use of many different chemicals that were highly toxic and highly dangerous to human life. As such, it was an absolutely critical link in the system that produced American's nuclear arsenal.

30.     To support the production of these components, Mound had a number of unique and specialized systems. It had an N-Ray system, almost unique in the nation, which, like X-Rays, could peer into solid materials. In contrast to X-rays, the N-ray looked for organics. The operation of this system, was, however very hazardous and required careful attention.

31.     Mound had a series of ultra-high speed cameras, of which there were only a handful in the world. These cameras could take photographs of exploding detonators so scientists could examine the explosion on an, almost, molecular level. Explosive test chambers designed to withstand the explosion of a 1-lb block of TNT one foot from the wall of the cell and electronic systems that could measure the function of the detonators to within one billionth of a second.

32.     Mound was, at one point, the largest source of stable isotopes in the world, selling these rare materials to laboratories everywhere. It designed and produced the radioisotopic thermoelectric generators, the nuclear batteries, which powered numerous deep space probes as well as some classified military programs. With its tremendous scientific expertise, in the 1970's it also was involved in many alternative energy source programs (including shale oil and other energy projects) as well as experimental use of microbes.

33.     The importance of the work to National Security during the cold war often took precedence over safeguards, which were not fully understood. As a consequence, persons were exposed to materials without being told the consequences.



34.     Materials were often handled and/or disposed of in ways that were a rough best guess, but which was totally inadequate. Human insensitivity and sloppiness also played a role in creating what would later be identified as a superfund cleanup site. Though efforts were made to improve even today there is much science does not know.

35.     Tritium, a neutron emitter, was studied and used extensively at Mound. Tritium, an isotope of hydrogen, is a radioactive gas that literally glows in the dark. It has many unusual physical characteristics. It bonds readily with water, it attacks gasket material, and it bonds with metals. Prolonged exposure to metal causes it to form stable metal tritides that have characteristics that are different than those of pure tritium. Pure tritium can readily be purged from the human body if it bonds with water and can be urinated out. In contrast, stable metal tritides cannot be so easily purged and have become a major concern as the plumbing of the various systems at Mound are cut apart and fine metal particles are produced that can be absorbed into the bodies of the workers. There is no established method for purging this from the human body, nor are dosage limits established. When these stable metal tritides are absorbed into the body and cannot be excreted, they remain in the body, bombarding it with the neutrons and acting as a carcinogen.

36.     Depleted uranium, which is currently thought to be carcinogenic and is toxic, was machined in M Building. Lithium deuteride blocks were pressed and canned and lithium tritide was processed as well. Beryllium, a metal noted for its toxicity, was processed in compounds with polonium and used in other products.

37.     Other materials, for which monitoring programs were established, include Radium-226, Actinium-231, Protoactinium-231 and 233, Strontium, Uranium 235, and Plutonium 238. A list of all the radioactive and hazardous materials held and studied at Mound over the years is several pages long. Indeed, there is a multi-volume study, over three-feet thick that is focused on the problem of hazardous materials that were once held and can still be found at Mound.

38.     Additionally, operations at the Mound Facility also generated various waste by-products, including the following:

39.     **TRU Waste -** TRU waste is a radioactive waste with any isotope, which meets all of the following criteria: atomic number greater than 92, a concentration greater than 100 nCi/gram, and a half-life greater than 20 years. There is only one disposal site for TRU waste - the Waste Isolation Pilot Plant (WIPP) that was approximately 10 years behind schedule for opening.

40.     **Mixed Waste -** Mixed waste is both RCRA hazardous and radioactive. This category of waste is extremely difficult to dispose of.

41.     **Waste from an RMMA -** A Radioactive Material Management Area (RMMA) is defined as an area in which the potential exists for contamination due to the presence of un-encapsulated or unconfined radioactive material or an area that is exposed to beams or other sources of particles (neutrons, protons, etc.) capable of causing activation. RMMAs are buildings, rooms, facilities, or areas where waste/excess chemicals or property is controlled as radioactive until proven otherwise.

42.     The workers at the Mound Facility, though not fully aware of the exposure to their bodies, were constantly reminded, by both the United States Government and their immediate employers, of the



importance of their work to the Nation. They were required to keep much of their work secret. They did so. They were required to take significant risks through exposure to radiological isotopes and hazardous, toxic chemicals without full knowledge of the dangers and safeguards. They did so.

43.     They received satisfaction of contributing to a better America, modest pay and promises by their government and their immediate employers, as set forth hereinafter and included representations that as breakthroughs in medicine and science occurred, they would be one of the first beneficiaries.

44.     However, when the Soviet Union collapsed, the Cold War heroes, many who had worked at Mound for decades, now found themselves superfluous. They'd made their sacrifices, they'd served their country, but they were no longer needed. A long series of early retirements and buy-outs began that soon turned into ruthless lay-offs, where executive bonuses were more important than the lives of the long serving staff, who had worked in high radiation, handled high explosives, and worked with innumerable hazardous chemicals and other materials. This lawsuit is about one such layoff or involuntary separation plan ("ISP") which not only violated established policies, procedures, directives and obligations, but further, unlawfully violated the contracts, civil rights of, and committed torts against the twenty-seven (27) Plaintiffs who worked at the Mound Facility, and are undoubtedly, some of the unsung heroes of the Cold War.

45.     Because of the high incidence of potential and actual exposure to both various types of radiation and toxic chemicals, it was very important to those working at the Mound Facility to have good quality and affordable health insurance that would carry them through their lives. High quality health insurance was the practice at the Mound Facility, until the arrival of BWXT and BWXTO in 1997.

46.     Indeed, many persons who left the Mound Facility found it virtually impossible to find a job that provided health insurance, because of concerns over potential exposures.

47.     Health insurance was supplemented by on-site physical examinations, specially geared to the types of potential exposures associated with operations at the Mound Facility.

48.     Despite the fact that routine physicals provided to the general public do not test for radiation levels or many of the hazardous chemicals found at the Mound Facility, BWXTO ceased doing full physicals, which were one of the benefits provided as a matter of course by EG&G, and Monsanto. Instead, BWXTO substituted paper questionnaires and misrepresented that these questionnaires were substantially similar. Though each Cold War Plaintiff specifically requested an exit physical, no one terminated as part of the June 26, 2001, ISP received a full physical.

## BACKGROUND ON THE CONTRACTORS, BWXT/BWXTO CONTRACT AND ITS IMPACT ON THE WORKERS AT THE MOUND FACILITY

49.     The original contractor at the Mound Facility was Monsanto, however, Monsanto's operations at the Mound Facility was under significant direction and oversight and control by the federal government and particularly, the Department of Energy (DOE).

50.     The DOE's direction and oversight included matters relating to workers at the Mound Facility and included conditions regarding treatment, wages, benefits, and employee rights such that the employees or



workers at the Mound Facility were third-party beneficiaries of many provisions in the contract between DOE and the contractor.

51.     Those employees who were members of unions could turn to the Union to make sure that the provisions in the contract created for their benefit were adhered to.

52.     Salaried/non-union employees have essentially two options. They could individually seek enforcement through internal company procedures or the courts, however, as a practical matter, this was cumbersome and prone to exposure for retaliation. The second approach was through the DOE.

53.     During the process whereby Monsanto decided to get out of the Mound Facility and the hiring of a new general contractor, EG&G, DOE repeatedly represented to non-union employees that the rights, privileges, and benefits they enjoyed under the Monsanto contract would continue.

54.     Provisions were inserted into the EG&G contract that continued the rights, privileges, and benefits.

55.     Additionally, EG&G was also required to first look to the existing work force for its needs. In return, DOE received from the work force stability in the work force makeup and avoidance of labor unrest.

56.     DE-AC04-88DP43495 signed on 6-30-1988, with modification MO75 signed 9-30-93, between EG&G Mound Applied Technologies, Inc. and DOE states under Part VI, Employee Benefits A.4 the following:

> "4.1 In the event of contract termination, continuing benefits to those employees, eligible for benefits (including disabled employees, eligible dependents, pensioners, and survivors), at the same levels of coverage and employee cost as in effect prior to contract termination, shall be provided as follows: (a) If there is a successor contractor, the DOE shall arrange for continuing of such benefits; and (b) If there is no successor, benefits shall be provided by one of the following arrangements: (i) A guaranteed insurance contract selected on a competitive basis, and (ii) Continued coverage under the Contractor's plans under contract with DOE whereby the Contractor will be reimbursed incurred in payment of benefits."

57.     When EG&G decided to end its work at the Mound Facility, these DOE representations and provisions for the benefit of the workers at the Mound Facility became even more pronounced as did DOE's need for a cooperative and stable work force.

58.     For example, during an "all hands meetings" on February 25, 1997, a DOE official, Ms. Snyder, made a presentation entitled "Status of Contractor Selection," which was presented to the Mound salaried work force, including Plaintiffs herein.  Ms. Snyder is a DOE policy maker and/or representative of person(s) who make and/or administrate DOE policy.

59.     Ms. Snyder represented that any new contractor would be required to have substantially the same benefits, for retained workers, as the predecessor contractor (EG&G) had, and specifically represented they would receive equivalent benefits.



60. Ms. Snyder and/or other DOE officials assured to Mound workers on other occasions, subsequent to the February 25, 1997 meeting, that "DOE makes every attempt to protect the benefits of the workers and also assured that workers would receive an overall comparable package of benefits.

61. Plaintiffs relied on these assurances.

62. Since these third-party beneficiary provisions existed in previous (EG&G and Monsanto) contracts, and there was a carryover effect, which obligated DOE and any future contractors to maintain these provisions. As a result, both DOE and the General Contractor held a fiduciary obligation and duty to the workers at the Mound Facility.

63. In approximately, 1996, the DOE solicited proposals to operate the Mound Facility. McDermott through B & W Federal Services (BWFS) and/or BWO (now BWXT of Ohio) (hereinafter collectively, including McDermott, referred to as BWXT) was negotiating and seeking to assume a contract for cleanup of the Mound facility in Miamisburg, Ohio. BWXT/McDermott were awarded the contract for cleanup of the Mound facility on or about July 15, 1997.

64. Contract number DE-AC24-97OH20044, signed on August 1, 1997, between BWXT and DOE, stated under Section H.30, pp 114-115, in pertinent part:

> "4. The Contractor shall provide pension plan which protects retirement and pension benefits (including individual vestment and retirement and retirement medical benefits) previously accumulated and accrued fringe benefits as of the last day of contract DE-AC24-88DP43495 for all retained and retired employees.
>
> "The Contractor may utilize its own corporate pension/benefits structure for all other employees hired and for former EG&G Mound Applied Technologies employees who may be hired back subsequent to the first full year of contract performance"

65. The workers at the Mound Facility were third party beneficiaries of the forgoing provisions of the EG&G and BWXT contracts. The foregoing provisions reflected the requirements set forth in the Request for Proposal (RFP), which set forth the parameters and restrictions, which must be included in the bid by any company seeking to replace EG&G.

66. However, BWXT significantly reduced or eliminated benefits. Benefits, including but not limited to: Medical Insurance - Lifetime Maximum: "lifetime cap of $1,000,000" reduced to "$250,000 per family"; Deductible: increased from "$200" to "$500"; Out of Pocket: increased from "$1,000" to "$3,500" (individual) and from "$1,300" to "$10,500" (family); Retired Spouse Benefits: from "continues for life" to "only six (6) months coverage after death of retiree." This is an extreme hardship to Mound workers, such as Plaintiff Mrs. Coons, who now must also share the $250,000 cap with her husband. This mounted marital insurance penalty, which would not exist if the married workers divorced and simply lived together. Co-pays also increased. The employee contributions also increased from "nothing," under EG&G and Monsanto, to "approximately over $2,000 a year." Further, not only was the quality of health insurance substantially inferior, but also, the health insurance carrier, United Health of Louisiana, was also substantially inferior in its administration of benefits; Cost of HMO: from "no cost" to "dependent upon salary and number of Dependents."



67. Life insurance benefits were similarly scaled back, from "company provided at 2.5 times salary at no cost" to "no coverage provided by the company" (employee may purchase term insurance through payroll deductions); Retire(ment) life insurance: from "25% pre-retirement coverage" to "$5,000;" Long term disability insurance: from "no cost" to "$.55 per $100 of salary"; Vacation: from "six (6) weeks maximum at 30 years" to "four (4) weeks maximum at 15 years."

68. Prior to and after the 1997 change in contractors at the Mound Facility, Defendants, their agents and employees, as well as the Department of Energy, made management level employees who were sent to the Mound Facility by BWXT aware that by law and the Mound contract, though not working directly for the government, their obligations were first and foremost to the Department of Energy and that they were under the rules and regulations of the Department of Energy; therefore, trained to enforce the contract with the Department of Energy, had training on ethics, as well as DOE's policies for the implementation of the contract and expected performance at the Mound facility.

69. The contract between BWXT/McDermott and the Federal Government was, on a cost plus award fee basis, meaning BWXT would be paid an amount, which included expenses such as salaries, wages, benefits, equipment rental, and all other costs anticipated to be incurred in the clean-up process, a fixed fee beyond actual cost and an incentive bonus. Actual expenses, such as hourly wages, are billed the end of the month after they were incurred through an end of the month invoice and/or certified payroll certified by the site manager as the true and accurate cost of what was spent on the government's behalf for the work bid on the Mound project.

70. Under the contract, BWXT/McDermott were required to first look to the existing work force to supply its needs for workers. Though some were laid off during restructuring and the 1997 work force during the period under Admiral (Ret.) Pete Heckman, the first Mound Facility site manager for Defendant BWXT, the work force at the Mound Facility under BWXTO management, was made up entirely of the pre-existing work force, with the exception of approximately twenty (20) new persons working at the Mound Facility.

71. Under the DOE contract, BWXT/McDermott was further required to assume responsibility for the existing collective bargaining agreement with union employees currently working at the Mound facility under the predecessor to the contract, EG&G. BWXT/McDermott was required to pay these workers the same hourly rate of pay in accordance with the then existing collective bargaining agreement and provide exactly the same benefits to these workers including insurance.

72. Salaried employees were required to have the same, or substantially similar personnel policies and benefits to that which was provided by EG&G, including insurance.

73. Under the DOE Contract, the only salaries BWXT/McDermott were responsible for were the salaries of seconded (pronounced "secunded" and hereinafter referred to as "secunded") and/or "key" employees for the portion of their salary, which DOE identified as more than proper for the job. However, the use of secunded employees was expected to be limited and not to displace Cold War Workers. As a practical matter, all secunded employees' salaries was paid by or reimbursed by the federal government.

74. Though it was anticipated that the work force would decrease as the cleanup progressed, under the matrix plan originally bid and/or 1997 work force restructuring plan that was still in effect during the 0221 ISP, large-scale layoffs were not anticipated under Admiral Heckman. The plan was to recycle the



existing work force to the extent practical by informing existing employees well in advance of jobs being abolished and other jobs that were opening up as the remediation progressed through various stages of clean up. This would also give the specific employees affected ample opportunity to seek employment elsewhere within or outside the Mound Facility.

75.     Although the contract was well received by the government, the private sector and independent observers had serious doubts.

**REACTION TO 1997 CONTRACT**

76.     On or about August 11, 1997, the Weapons Complex Monitor reported that the BWXT bid for remediation was $200 million below the second best proposal monitored. It further reported that competitors were stunned and not only predicted that remediation could not be done in the 5.3 years projected by the bid, but further predicted that then current tritium release limits would not be followed. It further indicated that to even try to accomplish the goal of the bid meant, "don't comply with the 3161requirement."[2]

77.     The Weapons Complex Monitor report further stated that one "competitor suggested" the cost of the fringe benefits for Mound employees are 53 percent of their salaries . . . if you assume the fringe benefits are going to be 28 percent, you are being completely unresponsive to the 3161 requirements, which are in the RFP (Request for Proposal)."

78.     The DOE knew or should have known that the contract proposal was not feasible and/or not likely accomplished and should have been especially vigilant about circumstances that would lend itself to tritium releases in excess of standards and/or would give rise to lack safety enforcement. For example in the June 2001 ISP, the entire staff compliance auditors, e.g. Plaintiff George Nafziger, were laid off resulting in a significant lapse in safety.

79.     The reactions to the BWXTO contract were, as a practical matter, verified as true in a DOE audit report, dated May 2, 2001 ("Audit") and confirmed what was obvious in the August 11, 1997 Weapons Complex Monitor.

80.     The results of this Audit found in pertinent part: "Under BWXTO's current schedule, it will not meet the cost and schedule provisions of its contract with the Department. In fact, the latest estimate for project completion is December 2009. MEMP will not be closed on schedule because the Department and BWXTO committed to a project completion date without knowing whether the date was achievable. **The date was established with limited knowledge of soil and building contamination at the site. . . . BWXTO did not develop a valid baseline to effectively manage the project.** Consequently, the estimated cost to complete the closure of MEMP has grown from $427 million to over $1 billion . . ."

81.     After noting that the BWXTO contract called for completion and exit no later than September 30, 20005, the Audit's conclusions and observations stated in pertinent part: "BWXTO's latest estimate to complete the project was December 2009.  The September 2005 deadline will not be met because **the Department and BWXTO committed to a project completion date without knowing whether the date was achievable.  Additionally, BWXTO did not develop a valid baseline to effectively manage the project.**"

---

[2] Section 3161 of the National Defense Authorization Act ("3161") for fiscal year 1993.



82.     Despite the concern about acting without proper planning expressed in the DOE audit, Defendants proceeded with an ISP that did not comply with planning requirements designed to avert problems arising in an Reduction In Force ("RIF"). As a result, the RIF resulted in significant violations of law and contract provisions, especially those created for the benefit of the workers, either directly or as third-party beneficiaries. Additionally, the predictions suggesting shortcuts in safety and unsafe handling of radioactive contaminations would force an untimely end came true and/or occurred and/or are occurring.

## PERTINTENT REQUIREMENTS AND PROVISIONS OF THE MOUND CONTRACT

83.     The solicitation for bid prepared by DOE and, later, the contract and modifications thereto included many DOE required protections for the existing work force at the Mound Facility.

84.     The documents, laws, regulations, and/or directives and requirements therein were incorporated into the contract in such a manner that the requirements and policies of these materials became the policies applicable to the contract separate and apart from the laws themselves and without any procedural restrictions associated therewith.

85.     The solicitation for bid and/or contract and the other materials referred to above are voluminous and, therefore, not attached pursuant to Civ. R. 10. However, pertinent provisions do include the following information and provisions set forth below.

86.     Compensation to workers at the Mound Facility including wages, salaries, and benefits of all types was expected to, at a minimum, reflect and "adapt the normal practices and conditions of the industry" in other words, follow industry standards.[3] The industry standards would also include industry standards regarding retirement standards, pensions and health insurance.

87.     The contractor was to endeavor to provide training and developing needed skills taking into account all of the concerns associated with the remediation clean up including not prematurely displacing the existing work force and following preferences required for certain protected classes including, but not limited to, Cold War Workers, Vietnam Veterans and so forth.[4]

88.     The solicitation, contract and/or modification required implementation of Section 3161 of the National Defense Authorization Act ("3161") **for fiscal year 1993** which required certain preferences in the job placement of workers currently and/or in the past employed at DOE facilities including the Mound Facility.[5] Unless otherwise specified, each of the Cold War Plaintiffs is a Cold War Worker entitled to 3161 protection.

89.     Department of Energy Regulations mandate that all Management and Operator (M&O) Contractors, such as the Defendants, abide by all applicable laws, rules and regulations and policy so that Congress' legislative mandates will not be sidestepped. As a result, 48 CFR 970.0470-1 requires every such contract to contain a detailed list of all laws, regulations and DOE Directives, which the contractor must comply. See also 48 CFR 970.5204-2 and contract between DOE and BWXT, Clause H-9 ("Omission of any applicable law or regulation from the contract does not affect the obligations of the contractor to comply with such laws or regulations..." The list of applicable requirements is frequently

---

[3] 48 CFR 970.2201-1-2 (a) (3).
[4] 48 CFR 970.2201-1-2 (a) (6).
[5] 48 CFR 970.2672.



reviewed and amended (through a contract modification) to ensure that the contractor is aware of its obligations.

90.     The contractor is required to abide by and comply with all federal, state, and local laws and all regulations including DOE regulations.[6] The contract has provided a list of DOE directives or parts thereof, which the contractor was required to comply with.[7]

91.     DOE Policy relating to the promotion of diversity is set forth in 48 CFR 970.2671-1. This policy is made applicable to the Defendants through a mandatory contract clause (48 CFR 970.5226-1) that required the Defendants to submit a Diversity Plan to the Department for approval. The Defendant was responsible for implementing (and annually updating) the plan. This contractor was required to submit and comply with a diversity plan and annual updates which was required to include strategies for increasing opportunities to fully use the talents and capabilities of a diverse work force including promoting diversity through the existing work force at the Mound facility.

92.     Section 3161 of the National Defense Authorization Act for Fiscal Year, 1993, codified at 42 U.S.C. 7274h, requires the Secretary of Energy, upon the determination that a change in the work force is needed at a defense nuclear facility, to develop a plan that has the objective of minimizing social and economic impacts to workers and communities.

93.     Defendants as contractors and/or subcontractors at the Department of Energy defense nuclear facilities have a responsibility to mitigate the social and economic impacts of work force restructuring and displacement resulting from a determination by the Secretary that a change in work force is necessary pursuant to 3161 as implemented by applicable DOE plans. The DOE contract at the Mound Facility by virtue of applicable federal regulations requires a hiring preference for employees whose employment has been terminated under a Section 3161 restructuring action and applies the hiring preference requirements of 48 CFR (DEAR) 926.7103 to management and operating contracts.

94.     To comply with 3161, the Department of Energy has promulgated guidance for development and implementation of the plans envisioned by Congress in Section 3161. The guidance applicable at the relevant time was published in the Federal Register on December 11, 21998. 63 FR 68441. To implement 3161 the Mound facility prepared a "Work Force Restructuring Plan" that was published in July of 1997, and presumably submitted to Congress.

95.     Through numerous directives, regulations, contract provisions and policies, the Department's obligations under 3161 are made applicable to Management and Operator Contractors. See, e.g.: 48 CFR 970.5226-2 (previously 48 CFR 970.5204-77), 48 CFR 926.7101, 48 CFR 970.2672 (previously 48 CFR 970.2602-1), 48 CFR 952.226-74, DOE Order 3309.1A, DOE Order 350.1. The regulation at 48 CFR 5226 requires the contractor to comply with the applicable WFRP and use its best efforts to accomplish work force restructuring or displacement so as to mitigate social and economic impacts. Further, the Contract cements the requirement by stating that "[t]he Contractor shall implement and execute any Department of Energy Work Force Restructuring Plan, including preference in hiring…" Department of Energy Contract No. DE-AC24-97OH20044, Clause H-16. Adding more specificity to the Contractor's obligations, DOE Order 3309.1A contains specific applicable requirements that mandate that the contractor provide special incentives, transfer opportunities, retraining, a "60-day in person" notice to

---

[6] 48 CFR 970.5204-2 (b).  The operative language is "shall comply."
[7] 48 CFR 970.5226-1.



workers scheduled for layoffs, and again reiterates the applicable prohibition against discrimination. (The contractor can substitute the 60-day notice with compensation for the 60-day period.)

96.     To facilitate the implementation of 3161, the DOE published a "Work Force Restructuring Reference Guide," dated December 21, 2000, which stated in pertinent part: "Strategic plans would relate approved project schedules and contractor projections of the numbers and skills of workers to do the work. Workers would then have a clear picture of when assigned work was complete and would have time to identify opportunities for continuing work or pursuing other career opportunities in the private sector.

97.     The D.O.E. guide stated, "The primary measure of success of the DOE-Ohio Work Force Restructuring Plan will be when the majority of workers leave each site employed versus unemployed."

98.     In implementing any work force restructuring, both the contract and applicable regulations and rules imposed significant restrictions on the use of overtime so that significant increases in overtime would not be used as a tool to displace existing Cold War Workers at the Mound Facility.[8]

99.     Similarly, though the contractor enjoyed discretion in hiring of certain management level positions when managerial displacement was of a Cold War Worker, that worker still enjoyed preference in hiring for non-management, technical positions for which they qualify.[9]

100.    The contractor is required to provide a hiring preference for employees whose jobs are or will be displaced "for any employment openings under the contract contingent on: (i) the employee meeting the qualifications for the position; (ii) the employee not having any conflict of interest that would preclude accepting the position; (iii) the employee not having accepted benefits that include post-employment restrictions that preclude accepting the position." [10]

101.    Contractors and subcontractors at the Mound Facility were specifically mandated to have a responsibility to mitigate the social and economic impacts of work force restructuring and displacement consistent with any DOE work force-restructuring plan in effect.[11]

102.    Further, in implementing any work force restructuring plan, the contractor is required to apply applicable incentives consistent with the objectives of Section 3161 including retraining; early retirement; options to avoid layoffs; retraining for new missions; out placement assistance including tuition reimbursement; relocation assistance and 60 days individual layoff notice.

103.    The contract further provided that all then existing EG&G Mound Applied Technologies employees that were hired or retained, the contractor "shall credit all retained employees with their current length of service toward fringe benefits including but not limited to vacation, retirement benefits and severance pay,"[12] and "shall honor accrued fringe benefits."[13]

---

[8] Part H.29.
[9] Part H. 30 Mound Contract.
[10] Part H. 30 Mound Contract.
[11] 48 CFR 97012672-1, 926.7101-7104.
[12] H.30 #5,DOE/BWXT Contract.
[13] H.30 #5, DOE/BWXT Contract.



**BRANNON & ASSOCIATES** • 124 East Third Street, Suite 403 • Dayton, OH 45402

104.    In addition to the preference in hiring for Cold War era workers under Section 3161, the contract required a bonafide and proactive affirmative action program designated for special disabled, Vietnam Era Veterans and handicapped workers, as well as other minorities and women.[14]

105.    In March 1997, the DOE, Ohio Field Office, prepared a new draft *Work Force Restructuring Plan* to provide the context for future work force reductions at Fernald and Mound. According to that plan . . . decisions on when work force changes are needed will be made by the DOE and the contractor, considering a variety of factors such as cost, worker skill mix, and cleanup schedules.

106.    According to the Plan, Contractors determine the number and skill mix of workers needed to complete project work on the time line set out in that Plan. When cleanup projects are complete, workers will lose their jobs if they cannot be retrained or reassigned for continuing work at the site. The DOE's objectives for outsourcing work are to improve productivity, avoid capital expenditure, or gain expertise not available at the site, and not to reduce wages and benefits for existing employees . . .

107.    According to the Plan, Contractors will identify new job opportunities for "at risk" workers within the company so individual career planning can begin in advance of the need to change the work force. . . . If voluntary measures are not sufficient to achieve the necessary changes in the work force, the contractor will recommend to the Ohio Field Office an involuntary separation program.

108.    Consultation with Stakeholders is required by the Ohio Plan. According to the Plan, Stakeholders should include represented and non-represented members of the contractor work force, and community reuse organizations. They will review the *Work Force Restructuring Plan*, the contractor's Worker Skills Analysis Plan, and the cost of any *Plan* benefits. In a public forum, the Department will provide information on the Work Force Restructuring Plan and the site-specific proposals to change the work force, considering impacts to cleanup schedules, employment levels, and local economic conditions at the time. The Department will consider stakeholder comments before determining the final level of any *Plan* benefit for the involuntary separation program.

109.    The Ohio Plan requires contractors to prepare appropriate legal documentation and meet reporting requirements specified under a variety of laws and regulations. The applicable laws include . . . ERISA, ADEA and the Older Workers Benefits Protection Act (OWBPA). Each worker will receive notice consistent with his or her employment contract procedures and with other laws and regulations such as the Worker Adjustment and Retraining Notification (WARN) announcement, if appropriate.

110.    The Plan also requires the contractor to conduct an exit interview that includes a comprehensive explanation of the right to a Section 3161 Preference-in-Hiring. The contractor will assure that the Section 3161 Preference-in-Hiring information is annotated on the DOE's Job Opportunity Bulletin Board System (JOBBS) for nationwide distribution. The contractor will also provide, quarterly, to the Ohio Field Office a list of site workers using their Section 3161 Preference-in-Hiring, as well as successful placements at other DOE sites.

---

[14] L. # 1 of solicitation for bid and H. 33 of Mound contract. 29 CFR 1625 Regulations implementing the Age Discrimination in Employment Act. 29 CFR 1620 Regulations implementing the Equal Pay Act. 29 CFR 1608 Regulations implementing the Affirmative Action, 29 CFR 30 Regulations implementing EEO in Apprenticeship training, 38 USC 2102 Vietnam Era Readjustment Act, 41 CFR 60-20 Regulations implementing requirements relating to Sex Discrimination, 41 CFR 60-250 Obligation of Contractors for Disabled Vets & Vietnam Era Vets, 41 CFR 60-741 Affirmative Action obligations of Contractors for handicapped workers, DOE 350.1 Contractor Human Resource Management.



111.    The Plan requires Contractors to develop a transition program that addresses the reliance on voluntary separations, and careful development of transition plans for individual employees. Contractors will assure that each worker is fully aware of the relationship of his or her specific job classification to the areas where reductions are planned within the next two (2) years.

112.    This transition program will define ground rules for equal access to this program for all "at risk" workers and assure open communication about the program throughout the site. Workers in job skill areas . . . of contractor-provided benefits to plan for their ultimate transition. The goal is to encourage those workers to use a contractor's transition program to move toward new careers, thus avoiding an involuntary layoff where there is no continuity of employment.

113.    The Ohio Field Office Plan acknowledges that the Department has a legislated responsibility to minimize the impact of work force change on workers employed during the Cold War.

114.    Contractors will charge the costs for any voluntary transition programs, normal contract severance, and any *Plan* benefits to each site's program management account.

115.    According to the Plan, Outplacement Services are available to all involuntarily separated workers for one year after their separation date.

116.    Education and Training Assistance for separated employees is available to involuntarily separated "Cold War" workers, who may apply for this benefit up to one year after their actual separation date.

117.    Preference-in-Hiring provisions give certain workers a preference in obtaining a new job with the Department's contractors at the current site or other sites across the country. . . . assure that the preference and other information is put into the Department's Job Opportunity Bulletin Board System (JOBBS) and that the system reflects the current status of each worker who qualifies for the preference.

118.    Work Force Planning is required by DOE-Ohio's plan, which requires contractors to review their in-house work force for the appropriate skill mix to do the work, and to identify areas of worker skill surplus or shortage. Contractors are then responsible for reassigning workers with the necessary skills, retraining workers for new skills or separating workers not needed for continuing mission.

119.    The DOE knew of should have known that BWXTO endeavor to emasculate 3161 requirements especially regarding benefits and as predicted after the contract was awarded.

120.    Further as alleged hereinafter to June2001 ISP reflected a significant violation of 3161 rights and protections of the work force.

121.    With regards to the benefits due the unsung cold war heroes of the Mound Facility, as late as August 15, 1997 BWXTO still had not put together and presented to the Mound workers the benefit package.[15]

122.    The DOE required that all non-union Mound employees first consent to release of their personnel files to Babcock and Wilcox transition team and later resign their employment to be eligible to continue

---

[15] By memo dated August 15,2001 1997, and distributed to the Mound work force, they were told: "during the next few weeks, we will also be holding a series of scheduled briefings to address issues such as benefits and will provide to each of you a comprehensive summary of benefits."



**BRANNON & ASSOCIATES** • 124 East Third Street, Suite 403 • Dayton, OH 45402

21

working at the Mound facility. However the resignation letter specifically workers specifically retained accrued and existing EG&G benefits and such benefits were protected in the original BWXTO contract.

123.    Those who were now in charge of the Mound project viewed the project as an opportunity for placement of regular employees from the McDermott Family of companies and displaced existing workers at the Mound Facility under the guise of being a secunded employee. Many of these so called secunded employees did not have special skills not found inn the employee population at the Mound Facility, were not subject to Cold War Worker protections (3161), and were not in specially sensitive positions heretofore typically associated with secunded employees. Additionally, many of these secunded persons were unqualified or less than qualified when compared with existing Mound employees but were hired at the facility often without the job being posted so that existing workers could not compete. In each instance, local DOE approved the placement of the so-called secunded employee.

124.    No secunded employees had their positions terminated under the ISP.

125.    Additionally, Defendants avoided certain posting requirements so they could bill and/or overfill positions with McDermott employees from other projects that were winding down and/or concluding, and thereby provide full time employment for favored McDermott employees. Accordingly, there was great resistance to complying with this and other provisions of the Mound contract which resulted in Defendants gaining greater profits than what otherwise would occur if the contract was fully and properly implemented, but with the practical affect of displacing the Cold War Workers at the Mound Facility. For example, a long time McDermott employee, Mr. John Russell, who was a friend of Baker and had worked for Baker in the past, was available from a project at West Point, Mississippi and would otherwise be without a job. Baker arranged for Mr. Russell to be put on BWXT's payroll and secunded to the Mound Facility. Another example was the position awarded Mrs. Judi Russell when she first came to the Mound facility as a clerk in Human Resources in 1999. Initially the position was properly posted, but later was withdrawn. Both Russell's hiring accomplished without the necessary posting of the position as required by the DOE.

## LAYOFF PROCESS

126.    In the fall of 2000, Defendant Baker announced that due to a serious and unanticipated budget reductions, restrictions, and/or shortfalls BWXTO would have $20,000,000 less than projected for fiscal 2001 and would, therefore, have to initiate a significant RIF. However, this claim was untrue.

127.    The Congressional Budget Committee recommending funding for cleanup of the Mound Facility made the following statements and recommendations regarding appropriations for fiscal year 2002:

128.    The Committee is very concerned with the delays in the cleanup of the Mound Facility. Clean up of the site is continuing to slip and now appears to extend significantly beyond fiscal year 2006. The Committee expects the Department to develop a baseline closure plan that supports the 2006 closure date. There are clearly many steps that can be taken at this site to accelerate cleanup activities and reduce managerial, bureaucratic, and worker inefficiencies, while still protecting the health and safety of the workers and the community. The Committee strongly encourages the Department to explore alternative approaches to the cleanup that are truly innovative and will restore the schedule and reduce overall costs. The Committee also believes the Department should consider other health and safety regulatory oversight processes that could



**BRANNON & ASSOCIATES** • 124 East Third Street, Suite 403 • Dayton, OH 45402

22

reduce costs and accelerate cleanup of the site. The Committee understands that increased resources over current levels may be needed to meet the 2006 closure date, **but will not consider additional funding until the Department demonstrates that substantial changes have been made to current operations to ensure successful cleanup by 2006. The Committee recommends $91,000,000, an increase of $20,061,000 over the budget request of $70,939,000, and consistent with fiscal year 2001 funding levels. Additional funding of $1,000,000 has been provided in the fiscal year 2001 supplemental appropriations bill to support the closure activities.**

129.    The import and practical affect of the Budget Committee's recommendations was that over $21,000,000.00 was added to the budget and when some sort of strategic plan was developed for feasible closure of the cleanup at or near the then governing projected date in 2006, even additional funding would be available.

130.    As a result DOE was required to develop a plan. The DOE delegated responsibility for the plan to BWXT/BWXTO. BWXT/BWXTO instead informed the work force that there would be significant layoffs because of a $20 million budget shortfall, without revealing that the money would be forthcoming upon the presentation of the aforementioned strategic plan. BWXT/BWXTO had been required to provide periodic developmental or strategic plans for the remediation of the Mound Facility; however, since the functional departure of Admiral Heckman in early 1998, a bonafide plan was never truly presented.

131.    Defendants also claimed that the reasons for layoffs were also because BWXT/BWXTO funding "would not include $10 million of previous carryover funding, which was the case in the past year,"[16] as well as increased pension costs. However, in reality, carryover funding exceeded $6 million and the pension plan costs were significantly less than previous public estimates.[17] The additional funding would also largely offset the difference referred to by the Budget Committee, if Defendants would only provide a feasible plan. Further, DOE was required to fund any pension deficits.

132.    Defendants then proceeded to organize a significant layoff claiming it was necessitated by budget decrease without actively revealing that the decrease would be abandoned upon development of a plan.

133.    Any work force restructuring plan required individualized notice as to which specific jobs were subject to abolishment, as well as disclosure of which new jobs were opening up or becoming available and allowing persons holding affected jobs to apply or bid on opening positions. However, this requirement was not complied with.

## REDUCTION IN FORCE (RIF)

134.    Defendants, during the RIF process, purposefully refused to post many and/or all of the positions that were opening up as a result of the reorganization.[18]

---

[16] Letter by Sandy Baker to Mound employees, dated April 12, 2001.

[17] See questions from ISP meeting, 6/25/01, pp 7-8.

[18] Questions from ISP meeting, 6/25/01, p 8.



**BRANNON & ASSOCIATES** • 124 East Third Street, Suite 403 • Dayton, OH 45402

23

135.    The RIF proceeded in two stages. The first stage was a Voluntary Separation Plan (VSP) whereby certain employees were supposed to be provided with incentives to voluntary give up their job and certain rights. The second stage was an Involuntary Separation Plan or forced layoff, which itself could occur in stages or at different times.

136.    Defendants suspended the February - March 2001 job evaluations. Though annual raises were due on or about March 2001, no Plaintiff received their raises, unless otherwise indicated. Had these raises been timely provided they would have enhanced the individuals' salary, unemployment compensation, severance pay, and future retirement pay, the exact amount of which will be determined through discovery. Those who were not discharged received pay raises on or about September 2001, retroactive to their normal raise date of on or about March 2001. The average salary increase in the September 2001 raise was approximately 5%. Thereafter, BWXTO returned to the normal raise date of approximately March in 2001.

137.    Defendants did pass out what was claimed to be a knowledge, skills, and abilities inventory form ("KSA") to employees and had individual manager(s) rate the employee. However, the KSA was not represented as part of the ISP process, but rather, only for use during the voluntary separation program (VSP) process. A letter by Peyton Baker, dated February 8, 2001, which accompanied all KSA forms, he stated in pertinent part: "BWXTO is currently facing a serious budget deficit in FY02. To help alleviate some of the deficit, BWXTO's management has submitted a proposal to the Department of Energy for approval of a voluntary separation program (VSP) for salaried employees. . . . Your management will be evaluating all salaried employees as one of the first steps in the process of approving personnel to leave under a VSP. . . ."

138.    Accordingly, persons who did not anticipate being part of a VSP or did not desire VSP, did not fill out the KSA as carefully as they would have if they had not been mislead as to its use in the ISP process.

139.    Further, certain job categories and positions were published as not being subject to layoff. For example, at various times, persons classified as technologists (such as Plaintiff Hurston), were told during the VSP process that they were not subject to any layoff during the later ISP process.

140.    Attachments to a memo announcing the VSP and dated March 1, 2001, by Defendant Baker, represented that out of 490 salaried/non-union employees subject to layoffs, only 92 jobs were to be abolished in the combined VSP and ISP process. These same attachments represented that other categories of jobs would not be abolished, such as media techs and accordingly, Plaintiffs (such as Jim England) did not sign up for the VSP to their detriment. In other instances, the listing of the number of jobs in a given category subject to layoff allowed individuals to assess their chances and further, to inquire of their supervisors whether their specific job was going to be or could be eliminated. Accordingly, Plaintiffs (such as Carolyn Andrews) did not take VSP because of representations of job security made to them by decision makers.

141.    In other instances, Plaintiffs who were not eligible for the VSP had foregone other opportunities in the private sector when the affirmative representations of decision makers, alone or in conjunction with other written representations, indicated the individual would not be part of the ISP.





142.    Accordingly, in reliance upon these representations, many Plaintiffs and other Mound workers did not sign up for the VSP.

143.    The representations in the VSP process were also false and misleading in respect to the number of positions targeted for abolishment being 92. Actually, approximately 150 positions were lost in the ISP and VSP processes, while Defendants anticipated bringing into the Mound Facility over 100 new persons in the form of secunded employees and new positions, such as demolition technicians without affording the ISP employees an opportunity to bid or apply for these positions prior to layoff. Other Mound workers who were forced to take retirement with significant reduced pensions were later denied positions when new jobs were made publicly known shortly after the ISP. Further, under established policies and past practices, Cold War Workers currently working at the Mound Facility subject to layoff had preference over persons who were laid off in (the) past or not laid off. These preferences were lost once layoff occurred in a way that would not have occurred had the workers been properly informed and provided an opportunity to apply before the ISP.

144.    Further, the individual employee was not allowed to see the rating of the manager and, therefore, was denied any input to dispute specific claims of deficiencies. Further, since the matrix system often listed persons who were working for one group and manager as a practical matter assigned and working for a different group and manager or reporting to more than on manager. Accordingly, the manager assigned to rate a given employee often was unfamiliar with the individual's work or only somewhat familiar.

145.    Defendants did not inform the work force which specific jobs were being targeted for layoffs and in some instances, led employees to believe specific job categories (e.g. technologists) were not subjected to the ISP. Accordingly, Plaintiffs, such as Ms. Kay Hurston, who was eligible for retirement in August 2001, did not sign up for the voluntary separation plan (VSP) and lost many rights because of being misinformed.

146.    Further, Defendants did not inform employees which jobs were opening up so that they could bid on them and maintain employment and more fully protect their employment, pension and retirement.

147.    An egregious example, Plaintiff Jim England, who performed in a DOE mandatory position, was terminated under the ISP only to return several months later working for a subcontractor doing exactly the same job, for thousands of dollars less and without contribution towards his pension. The difference in pay and benefits was paid to the subcontractor.

148.    In another example, Plaintiff Teresa Fox applied for and was accepted for a position posted only a couple months before the ISP, after being led to believe the job would continue after the ISP. It, too, was a DOE mandated position. After working in this new position only a couple months, Ms. Fox was terminated in the ISP.

149.    Another result is that after the ISP, many of the remaining employees worked numerous hours of overtime. In one instance, a co-worker in Plaintiff John Bruno's group worked thousands of dollars of overtime, which could not justify Mr. Bruno's loss of job, especially since within a year, Mr. Bruno was returned to work doing essentially the same job he did before the ISP.



However, because of the time lost, Mr. Bruno had virtually no chance of participating in full retirement.

150.    The most obvious violation occurred with the positions of Demolition Technician created after the ISP when Defendants knew, or should have known at the time of the ISP, that the position would be created. Not only did none of those subjected to the ISP have the opportunity to bid on these positions prior to termination but, afterwards, were shunned from these jobs, especially if they were Cold War employees who were forced by the ISP to take a reduced early retirement, or if the Cold War worker was a woman.

151.    As a practical matter, the ISP process was rampant with abuse, discrimination, and retaliation and significant disproportionate impacts on protected groups.

152.    Defendants used the layoff as an opportunity for individual targeting and to retaliate against workers. An example of individual targeting occurred with Jim England as set forth in greater detail hereinafter.  Mr. England held a DOE mandated position, which was nonetheless abolished, then subcontracted out. The subcontractor hired Mr. England who was paid less with the subcontractor pocketing the difference. Many of the Plaintiffs were targeted because they would not suppress or lie about unauthorized or improper radioactive releases (e.g. Elias Spyrou and Mark Becker) or had, in the past, reported wrongdoing and improper activities by officials (e.g. George Nafziger and Rick Christopher).

153.    Defendants also eliminated all safety compliance auditors, such as George Nafziger, with tragic results including an instance of Plutonium 238 contamination in November 2002 when Q-Tip swabs were improperly handled. The contractor and/or individuals responsible for the serious safety lapse were not disciplined. Defendants endeavored to keep this occurrence quite and not publicize this. No one knows how many other safety violations have been occurring at the Mound Facility since the June 2001 ISP, or how much radioactivity was encapsulated and buried or how many more Q-Tip swabs of radioactivity are waiting to be found.

154.    Females who were married to, or girlfriends, of high-level BWXTO male employees, and/or secunded employees were routinely not part of the ISP. The spouses and girlfriends were often awarded their positions without adhering to posting requirements, examples include, Ms. Barbara Hood, and Mrs. Judy Russell. Further, the female employee with whom Defendant Peyton Sandy Baker was engaging in an adulterous relationship was permitted to continue working and was not laid off. Female employees who were married to or girlfriends of high level BWXTO employees were not discharged under the ISP, and were not subject to discharge under the ISP.

155.    In contrast, female employees who were married to current and/or retired lower level male employees would routinely part of the ISP. Examples include, but are not limited to the following Plaintiffs, Mrs. Debbie Coons, Mrs. Carla Jendrick, Mrs. Cheryl Applegate. It was the defendants' policy and/or practice when a married couple worked at the Mound Facility to terminate the female spouse as part of the ISP provide one of the spouses was not in management or upper management.

156.    African-Americans in the salaried work force were both discriminated against and disproportionately impacted in the ISP. Out of approximately 32 Black salaried employees,



between 18 and 22 were discharged under the ISP, which was substantially greater than the proportion for white males. Plaintiffs Carol Robinson-Burks, Josephine Watson, H. Kay Hurston, and Albert Gibson were impacted and/or targeted.

157.    Mound workers of foreign national origin were discriminated against and disproportionately impacted by the ISP, with 50% to 100% being discharged, including Plaintiff Elias Spyrou.

158.    Defendants discriminated against workers who were handicapped or perceived as having a handicap and also determined that they would avoid hiring or rehiring handicapped individuals, such as plaintiffs Cheryl Applegate, Jim McKnight, Jerry Koons, and others who were handicapped or had family members who were handicapped or perceived as having a handicap.

159.    Female workers at the Mound Facility were also disproportionately impacted by the ISP.

160.    Workers who were nearing retirement age were also disproportionately impacted, targeted and/or discriminated against under the ISP especially workers able to receive full retirement by projected 2006 site closure date, such as Plaintiffs Tayse, Nafziger, Hurston, Watson, Barker, Coons, Nafziger, and others.

161.    The ISP severance package was different for younger less experienced workers than older more experienced workers. The younger workers received a proportionately greater severance and one-week severance pay for each year of service, whereas the older workers who served more than twenty year receive, as a practical matter, of a fraction of a week for each year of service. For example: those with 25 years of service received the equivalent of .8 weeks of severance pay for each year of service. Similarly those with 32 years of service received .625 weeks of severance pay for each year of service. Plaintiffs in this category include Ms. Watson, Ms. Andrews, Mr. Bowling Mr. Lamsa, Ms. Jewett, Ms. Jendrick, Ms. Coons, Ms. Barker, Mr. Gibson, Ms. Watson, Mr. Bruno, Mr. Tayse, Ms. Hastings, Ms. Wittehnagen, and Mr. Spyrou. Plaintiffs were also not paid a prorated portion of exit shares bonus.

162.    Though Defendants knew that additional workers would be needed following the ISP, Defendants decided they would avoid rehiring those who were displaced by the ISP, especially older workers who were entitled to preferences in hiring as 3161 workers, Vietnam era veterans, and especially, female workers.

163.    Of the 40 persons who took VSP, 17 to 18 positions were specifically identified as "replacement needed;" however, none of the ISP employees were afforded the opportunity to bid or apply for these positions prior to the ISP.

164.    After layoff, the ISP employees were not provided reasonable consideration, including lawful preference, for those positions and in some instances, completely disregarded, such as ISP females applying for demolition technician position.

165.    As noted above, one of the positions created was Demolition Technician (Demo Tech), which was paying, approximately, $16.83 per hour as starting salary. This position was essentially a restatement of the job, which many Mound workers who were laid off were in fact doing prior to the ISP. At the time of the ISP defendants knew or should have known that they would shortly



be creating a new position called Demolition Technician ("Demo Tech"), and/or that such a position would need to be created.

166. Defendants did not inform those subject to the ISP that the Demo Tech position would be opening so none of the workers terminated in the ISP were able to apply for the position. Instead defendants planned to enhance overtime for those who were not terminated until sufficient time had past so that the ISP would be less likely to be called into question. After sufficient time had lapsed the position of Demo Tech was created.

167. Defendants also decided they would avoid hiring female Demo Techs and, in fact, did not hire any female Demo Techs until summer of 2002 when a small number of females, who were not Cold War Workers, were hired.

168. Unless otherwise specified all female Plaintiffs applied for, sought, or desired employment as Demo Techs, however, they were not hired. Instead, males and/or persons under the age of 40 and/or younger than Plaintiffs were hired though Plaintiff(s) were as qualified, or more qualified, and those hired did not have the knowledge, background, or experience of Plaintiffs and/or could not be expected to retire out of the Mound Facility.

169. Female Plaintiffs and/or other retired Plaintiffs who were forced into retirement during the ISP, were unlawfully denied a position as a Demolition Technician and discriminated against though these Plaintiffs had equal or better qualifications of many if not most of those actually hired.

170. In other instances, persons were matrixed into a group shortly before the ISP to be trained by a targeted Plaintiff/individual. The newly trained person then would assume the targeted individual's job under the guise of restructuring. An example includes Plaintiff Paula Neibel.

171. During the months before and after the ISP, Defendants brought to the Mound Facility persons from the McDermott family of companies improperly designating these persons as secunded employees without posting these positions and/or without affording ISP employees an opportunity to be considered and/or without taking into account lawful preferences in hiring.

172. Though Defendants suspended the "normal posting process," some positions were posted as late as March and April 2001 and after the supposed rating process, and as in the case of Plaintiff Teresa Fox, represented as not being subject to the ISP. After the individual moved from a position, they were terminated under the claim of ISP job abolishment.

173. Several Plaintiffs originally entered the Mound work force as leased employees such as Plaintiffs Eby, Weinmann, and Bruno. Each of these Plaintiffs went direct from the leased arrangement to status as regular Mound workers. Mound workers who were part of the leased employee program were denied promised vesting rights when they were terminated in the ISP.

174. The leased employee situation involved a DOE approved arrangement that used temporary agencies, specifically Manpower and later, Bartech to hire workers to do the same work as others, but without providing them, the workers, the pay, benefits (including health insurance), and the opportunity for retirement that other persons were receiving and entitled to. From the inception, it



**BRANNON & ASSOCIATES** • 124 East Third Street, Suite 403 • Dayton, OH 45402

28

was recognized that the leased employee arrangement was not only wrong and unfair, but was unlawful or likely to be unlawful.

175.     When the particulars of the employee(s) leasing program came to light, the years of service performed by these Plaintiffs and others like them was recognized. In each instance the Plaintiffs received letters in the early 1990's informing them that their years as a leased employee would be recognized as vesting service for all purposes, except bumping.

176.     Ms. Eby and others inquired, with knowledgeable and appropriate officials, as to the meaning of 'vesting service' as used in the letters. She (they) were told that her time as a leased employee would count towards her retirement benefits package and everything else, except in the event of a layoff, it would not count for bumping rights.

177.     Furthermore, in 1991 prior to accepting a regular position at the Mound facility, it was represented to Mr. Bruno, and others, that years as a leased employee would be counted in his vesting rights and formed part of the consideration for accepting a position and/or was relied upon by Mr. Bruno.

178.     Before turning to individual Plaintiff allegations, the following general allegations are applicable to each and helpful in understanding the nature of the individual claims.

179.     Various performance scales were used at various times prior to the arrival of BWXTO. The BWXTO performance scale was from 10-60 with a score of 10 representing unsatisfactory, 20 indicating a need for improvement, 30 being satisfactory, 40 representing a performance of good, 50 representing a performance of very good, and 60 being a performance score of excellent.

180.     During the BWXTO years the retirement standard with health insurance was combo 80, which represented a minimum of 55 years of age and 25 years of service. However the industry retirement standard with health insurance was either the rule of 70 and/or combo 70 which represented 50 years of age and 20 years of service.

181.     The industry standard was to relax the retirement standard during VSP programs so that Cold War workers who were close to retirement could retire and thereby ameliorate the impacts of displacement.

182.     Under either combo 80 and/or 70 the industry standard allowed the Cold War worker to protect retirement benefits a year before he or she reached retirement age by designating an intent to retire, which could be revoked.

183.     All persons terminated under the ISP lost prorated vacation credits the exact amount and value of which will be determined for each plaintiff during discovery.



## INDIVIDUAL ALLEGATIONS

## GEORGE NAFZIGER

184.    Dr. Nafziger is a Vietnam War Veteran with two combat tours in Vietnam and continued to serve his nation in the Naval Reserve and achieved the rank of Captain in both Navy and Naval Reserve, until he retired in 1995. He had four command tours and at times commanded up to 150 officers and enlisted personnel. He received thirteen (13) military declarations, including three (3) for meritorious service(s). Dr. Nafziger has also earned an MBA in Management, and a BS in Industrial Technology.

185.    Dr. Nafziger worked at various jobs at the Mound Facility including, but not limited to, the following: Senior Contract Administration, Quality Control Engineer, Senior Quality Control Engineer, Senior Quality Assurance Engineer and Regulatory Compliance Specialist. Dr. Nafziger's work resulted in approximately $4M in costs savings.

186.    Dr. Nafziger's performance reviews prior to 1997 and contained comments including, but not limited to the following:

187.    "Ability to recognize area where...improvements and initiatives can reap large costs savings and has ability to implement same to capture there benefits;" "He performed an audit... identifying numerous problems and skillfully negotiating their rectification with the management responsible for the problem areas...;" "Provides direct positive support in ensuring compliance with Mound and DOE directives;" "His attentiveness... has repeatedly identified problem areas;" "Excellent support of his assigned programs;" "Conscious of continuous improvement;" "Extremely thorough;" Discovered grave errors;" "Highly professional;" "A surprisingly strong affinity for identifying cost savings;" "His work ethics are excellent."

188.    Under, BWXTO, Dr. Nafziger worked under the title of Engineer IV. Dr. Nafziger's first evaluation under BWXTO Management had an overall performance rating of 'Very Good' and he was credited with doing an "excellent job of auctioning the modular buildings that would otherwise have to be demolished by BWO...removal of these buildings is in most cases, 2 years ahead of the BWO plan. He has also provided a make-by determination for the print shop demonstrating flexibility in his assignments."

189.    However, with the change in functional direction following the *de facto* removal of Admiral Heckman in February 1998, Dr. Nafziger's qualities in problem identification and resolution, cost savings, and efficiencies were, by some, viewed as handicaps rather than assets.

190.    In 1998, Dr. Nafziger's duties included matters associated with real property transfers and he insisted that certain legalities be adhered to in the property transfers for which he had responsibility. His duties also included the FIMS program, which he established and populated. Dr. Nafziger felt he had a fiduciary duty that the law is conformed with and government (including DOE) interest protected.

191.    However, BWXTO'S local DOE's agenda was to create the impression of progress in reclamation, whether or not it was actually accomplices and/or regardless of whether law, rules, regulations, and guidelines were adhere to. Dr. Nafziger's insisted on following the law to protect the government interest (e.g. recording assessments) was looked on as an obstruction by local DOE.



**BRANNON & ASSOCIATES** • 124 East Third Street, Suite 403 • Dayton, OH 45402

30

192. BWXTO, and Local DOE officials, at various times, ordered him not to follow proper procedures, but Dr. Nafziger refused.

193. Local DOE ordered that he be removed from his position and be replaced by a Ms. Donna Gallaher and he was.

194. In 1999, without prior consent by him or reasonable notice and/or explanation Dr. Nafziger was moved to the Quality Audit group where he remained until the termination of his employment.

195. Afterwards, Dr. Nafziger performance evaluation dropped significantly. The summary of comment was a dichotomy. On one hand it was noted that; "He successfully supported the DOE in easement preparation and land transfer issues. The transfers of parcels D and the parcel approached were praised by the DOE and received a significant achievement. On the other hand, the same paragraph stated 'Read Property' transfers were conducted safely and for the most part in a timely manner. Building 91 was delayed to the point where DOE and upper management became involved, but was eventually removed from the site… The coordinator of the make/buy program experienced delays in process documentation and received a significant deficiency for the DOE.

196. As a result, in approximately early 1998 he applied for the position as Purchasing Manager.

197. However, despite an excellent background, including two (2) years as a contract administrator, Dr. Nafziger did not even get an interview.

198. Instead, the position was given to Mrs. Barbara Hood, who was then the wife of Scott Hood who was of one of the highest management level employees of BWXTO. Mrs. Hood had no prior management or significant contracting experience.

199. DOE approved of both the placement of Mrs. Hood and the by passing of Dr. Nafziger for consideration of this job.

200. As noted above, in 1999 Dr. Nafziger was moved to the Quality Audit group where his role was two fold: Program Management and Compliance Audits.

201. Program Management was the 'Lessons Learned Program'. 'Lessons Learned Program' was a DOE mandated program. Lessons Learned was integrated safety management and included, but was not limited to, identifying and publishing errors and successes so that errors would not be repeated and successes could be followed not only at the Mound facility, but also at DOE sites across the nation.

202. Dr. Nafziger was awarded the position because the previous person could not handle the job and did not have near the background of Dr. Nafziger. Yet, the same person was later given this responsibility with the termination of Dr. Nafziger employment as set forth herein after.

203. In the meantime, Dr. Nafziger took 'Lessons Learned' at the Mound facility to new levels. National DOE officials recognized his performance and as a consequence, he was appointed to the DOE Executive committee for 'Lessoned Learned,' which was a National level committee called SELLS.

204. Compliance Auditor component of the job required Dr. Nafziger to determine whether or not whatever was being audited was in compliance with, law, regulations, and/or manuals. In his compliance function he was essentially doing oversight process, which is a DOE function. For example, Quality



Auditors would conduct audits on general compliance with the DOE. Including matters associated with radiation safety. In another example, in late 1999 Dr. Nafziger was ordered to do a general compliance audit on the public reading room in Miamisburg.

205. He soon learned that the reading room was being used for storage and he learned that the contract for use of the reading room facility had expired five (5) months earlier with no on-going effort to renew. This was a significant violation including acceptance of goods and services in violation of the Anti-Deficiency Act.

206. The responsibility for maintaining the contract was with Ms. Hood's department. Dr. Nafziger noted the failure of compliance attributed to Ms. Hood's Department.

207. Ms. Hood's reaction was to scream at a Mr. Higgins, who was normally her superior, and demanded he remove the findings.

208. Mr. Higgins, realizing the special relationship Ms. Hood enjoyed, ordered Dr. Nafziger to remove the findings from his report, to wit; that the contract was not renewed and/or there was no contract and probable violation of Anti-Deficiency Act law. In other words, Dr. Nafziger was ordered to bury or hid the problem.

209. Dr. Nafziger initially resisted, but eventually did as ordered. However, he reported the incident to a DOE official who promised him 'whistle blower protection' and that his report would remain anonymous. Instead, DOE informed BWXTO of everything, and participated in the cover up. Shortly thereafter, Dr. Nafziger was informed by Mr. Higgins and other BWXTO officials that they were aware that he told DOE.

210. Not surprisingly, his February 2000 evaluation specifically noted, "His written assessment reports occasionally require management directed revisions in order to present findings and observations in the appropriate perspective, although the quality of George's reports is improving."

211. Though his analytical skills were assessed at 50 out of 60 points in February 1998, in February 2000 Mr. Higgins rated Dr. Nafziger only a 30. Furthermore, during the evaluation period covered by this appraisal, Dr. Nafziger was awarded his PhD, but it was not noted in his review.

212. Again, the warning was clear, 'stop adhering to proper standards and the law or else!' However Dr. Nafziger continued to endeavor to follow the law.

213. In March through May 2001, Dr. Nafziger did an audit on BWXTO and found Price Anderson Act violation relative to nuclear procedures, policies and unresolved safety regulations.

214. Instead of burying his embarrassing findings, as had been previously instructed, he reported the finding to DOE who was compelled to include this report in assessing BWXTO approximately $130,000.00 in fines.

215. Around the same time period Dr. Nafziger was almost struck by a vehicle operated by a private contractor with political connection. Dr. Nafziger yelled at the driver who stopped.

216. Dr. Nafziger truthfully informed the driver that he had the authority to permanently order him off the Mound facility and would do so if he saw him driving like that again.



217.    The driver then contacted DOE who contacted Mr. Higgins. Though, Dr. Nafziger had done no wrong, Mr. Higgins ordered Dr. Nafziger to apologize to the driver.

218.    During the VSP and prior to the above noted events it was reported that the quality Audits Group would be left intact and, at most, only one position would be abolished. Prior to the two foregoing incidents, his supervisor specifically told Dr. Nafziger that he would not be let go.

219.    Because of Dr. Nafziger's education, experience, background, and performance, the removal of him alone could not be justified.

220.    Despite the foregoing, four (4) out of six (6) auditors positions were abolished on June 26, 2002, and the remaining auditors, or persons doing the audit work for BWXTO, did not have the background or experience of Dr. Nafziger.

221.    At the time of Dr. Nafziger's termination of employment on June 26, 2001, he had achieved approximately 20-21 years of service and was 52 years of age and therefore had 72 points towards full retirement or Combo 80 retirement.

222.    Over the years, Dr. Nafziger had significant exposures or possible exposures to hazardous chemicals and nuclear radiation and has a minor daughter with Attention Deficit Disorder.

223.    The past VSP practice at the Mound Facility and industry retirement standard would have allowed Dr. Nafziger to fully retire rather than risk layoff. Dr. Nafziger would have retired rather than risk layoff.

224.    Dr. Nafziger's work and/or substantially similar work continued to be performed by younger and/or less experienced employees, and/or less qualified persons of the general or prime contractor and/or by subcontractors and/or by DOE

225.    Prior to the ISP, Dr. Nafziger was recommended to file a position as a special auditor for which he was fully qualified. The position was filled by an outside contractor and Defendant Baker represented that all outside contractors would be eliminated in favor of existing Mound workers. However, in this instance, the outside contractor retained his position.

226.    With the termination of employment, Dr. Nafziger lost retirement health insurance and will lose approximately 30% of his retirement pension.

227.    Additional proper payments, promotions and raises would have enhanced his retirement pay and/or unemployment compensation.

228.    Dr. Nafziger was not properly compensated or given raises when compared against younger persons doing substantially similar work and/or similar qualifications. He was also denied promotions because of he age and because of his sex.

229.    Dr. Nafziger would have continued to work until he reached fifty-five (55) years of age or the site closed; and as a consequence, he lost between approximately $201,000.00 and $400,000.00 in lost future wages.



**BRANNON & ASSOCIATES** • 124 East Third Street, Suite 403 • Dayton, OH 45402

33

230. At the time of termination, other employees who younger and/or were not in protected classifications were retained to do the same or substantially the same work that Dr. Nafziger was performing prior to his termination, though Dr. Nafziger was equally or better qualified.

231. After termination, Dr. Nafziger also applied for a position he qualified for, but was ignored. Instead younger and/or less qualified person and persons who were not Vietnam War Veterans and/or Cold War Workers and/or persons who could not reasonable be expected to achieve full retirement were hired instead.

232. As a result of the foregoing, Dr. Nafziger also lost tens of thousands of dollars in future retirement pay; the exact amount to be determined through discovery.

233. Dr. Nafziger, also, as a consequence of Defendant's failure to properly pay him and award merit raises, received less unemployment compensation than he should have received; the exact amount will be determined through discovery.

234. Audit reports on radiation and safety matter diminished in quantity and quality with health enduring and/or tragic consequences after the termination of the auditors. For example, on or about November 14, 2002, radiological contamination, specifically Plutonium 238 contaminated a laboratory. This contamination was traced to Q-Tip swipes taken from R-140 building/area that were handled in violation of established safety procedures. The radiation counts were off scale in excess of 6 million D.P.M. At least two (2) persons were contaminated in excess of their yearly permissible level. At least two (2) persons inadvertently ingested the radiation. Others were exposed.

235. No enforcement or disciplinary action was taken against those responsible for the contamination and/or those who abdicated their safety oversight responsibilities. The entire matter was concealed.

## RICK CHRISTOPHER

236. Major (ret.) Richard Christopher is a white male whose date of birth is May 23, 1946, and was initially hired to work at the Mound Facility on or about July 5, 1990, as a Contract Specialist after retiring from honorable service with the United States Air Force, where he had achieved the rank of Major.

237. In his military service to his country, Major Christopher held many positions of command and responsibility including, but not limited to, OSI Detachment Commander in Turkey and Air Force Office of Special Investigations where he focused on investigating white collar crimes committed by contractors. Major Christopher was also a Vietnam War Veteran.

238. During his work under EG&G management of the Mound Facility, Mr. Christopher consistently received overall ratings of excellent, including his last EG&G evaluation on or about March 13, 1997.

239. Supervisor comments included, but were not limited to, the following: "Richard is the lead ER buyer and he mentors buyers; coordinates close-out audits; interfaces with DOE; works closely with ER/DD Program managers in pre-procurement planning meetings and problem resolution; assists less experienced buyers with questions on complex procurements; leading and participating in 3 project teams; team leader for the Standardized Narrative Team; received an achievement award for this



**BRANNON & ASSOCIATES** • 124 East Third Street, Suite 403 • Dayton, OH 45402

34

outstanding effort; a major contributor in teaching classes for C&P personnel; taught Cost Accounting Standards, Weighted Guidelines and Congressional Affairs; responsible for renegotiating 5 Environmental Restoration (ER) BOA's; coordinates close-out audits; major contributor to C&P; valuable employee; effective work management; outstanding audits; works well with project manager;

240. Under BWXTO, Mr. Christopher was titled Senior Buyer performing the same functions as under EG&G. He initially reported to Mr. Donald Starks, Purchasing Manager, and long-term employee of the McDermott family of companies. Mr. Starks anticipated remaining Purchasing Manager until, at least, 2004. However, within a few months Mr. Starks was leaving the position.

241. When Mr. Christopher asked Mr. Starks about the opening, Mr. Starks cautioned Mr. Christopher and told him he could not apply for Purchasing Manager. Mr. Christopher applied anyway.

242. Mrs. Hood did not have the qualifications required for the job description of Purchasing Manager and was neither a Vietnam Veteran nor a Cold War Worker entitled to 3161 preferences.

243. However, it was already determined that the position would go to Mrs. Barbara Hood, wife of Scott Hood, the second highest level BWXTO employee at the Mound Facility. Mrs. Hood assumed the position in approximately February 1998. Because of the relationship between Mr. and Mrs. Hood, Mr. Christopher was not genuinely considered for the position as Purchasing Manager.

244. After Mrs. Hood's appointment, she started to assign Mr. Christopher significantly more work than others. Whereas, Mrs. Hood approved overtime for other members of her unit when she would not approve Mr. Christopher's use of overtime, often for the same project.

245. Whereas, Mr. Christopher has previously received on average, excellent ratings in his evaluation, his first performance rating in March 1998, under BWXTO and Mrs. Hood, dropped to very good. Further, though his overall performance was designated 050, the average of his individual criterion scores was, approximately, only, approximately 046. Whereas previous evaluations commended Mr. Christopher for assisting and training persons junior to him, Mrs. Hood's evaluation stated, "Rick should seek out opportunities to train/assist Buyer I's in becoming more knowledgeable in areas in which they have not received adequate training.

246. DOE and the federal government required persons working at the Mound Facility to produce accurate records of time spent working. The use of their records included reimbursement to BWXTO for salaries and wages paid to persons working at the Mound Facility, including Mrs. Hood.

247. In early July 1998, Mr. Christopher learned that Mrs. Hood was falsifying time records indicating she was working when in fact she was not. Mr. Christopher reported the falsification to appropriate authorities after he was assured that his identify would not be revealed, especially to Mrs. Hood or persons who would tell Mrs. Hood. However, Mrs. Hood was told about Mr. Christopher's allegations. The allegation against Mrs. Hood regarding falsification of time records was true.

248. On Wednesday, July 29, 1998, Mr. Christopher experienced difficulty accessing information off his computer. When he tried to reboot, a message appeared that he was not a valid user. Shortly thereafter, Mr. Christopher received a telephone call from Mr. James Gannon, Mrs. Hood's supervisor, ordering him to Mr. Gannon's office.



249.    When Mr. Christopher arrived, the head of security, Mr. Vince Hanson, was present along with Mr. Jim Jackson, head of Human Resources, who informed Mr. Christopher that a complaint had been made against him for "creating a sexually hostile work environment."

250.    Mr. Jackson and others had been told that Mr. Christopher had physically intimidated and/or assaulted Mrs. Hood. At no time was Mr. Jackson informed that Mr. Christopher had reported Mrs. Hood for falsifying time records. The alleged "investigation" into Mr. Christopher was removed from BWXTO Human Resources. Instead officials handled the matter with Defendants BWXT, McDermott Inc., and McDermott International.

251.    In fact, Mr. Christopher has never physically intimidated and/or assaulted Mrs. Hood.

252.    Mr. Christopher was told he was suspended and/or placed on administrative leave pending an investigation and publicly escorted by security to the security building where he was detained until his ride arrived at approximately 4:20 p.m. Thereupon, security escorted Mr. Christopher to the main entrance where he was ordered to turn over his badge. He was publicly humiliated and false stories were spread that he physically assaulted Mrs. Hood with sexual overtones.

253.    Mr. Christopher remained on suspension and/or administrative leave until on or about September 3, 1998, when he received a written reprimand on letterhead that read, *inter alia*, BWX Technologies Inc, Babcock and Wilcox, a McDermott Company. The written reprimand was signed by Robert A. Bergin, Director of Administration, BWXT, and stated in pertinent part:

254.    "As the result of an investigation into allegations that have created a disruptive work environment, it has been determined that your conduct is inconsistent with and in violation of the rules of conduct identified in Policy 7157. Rule 6 is an affirmative statement of what is expected of a BWO employee. Specifically, "Rule 6" requires that all employees respect the dignity of all individuals . . . Thus, the Written Reprimand is formal notice that future conduct of a similar nature will not be tolerated.

255.    Your job duties do not and should not include tracking the time worked or reported by anyone other than yourself nor should you have any reason to review and/or examine any time records other than your own . . .

256.    Thus, both in your interest and that of BWO, you will be reassigned duties with Site Transition . . . you will not engage in conduct similar to that addressed above and that you will abide by the Company's Rules of Conduct.  Failure to do so could lead to further disciplinary action up to and including discharge."

257.    In effect, this reprimand was reporting violations of the federal false claims act. This reprimand was not maintained in the personnel file kept at the Mound Facility.

258.    Roger Tetrault, Chairman of both McDermott Inc. and McDermott International was informed, *inter alia* by letter, dated August 16, 1998, of Mr. Christopher's report of time card violations by Mrs. Hood and the subsequent treatment of Mr. Christopher.

259.    All Defendants knew or should have known of the misconduct and wrongful actions directed against Mr Christopher. No official "investigative report" was ever created of the incident.



260.    Prior to July 29, 1998, computer maintained employee time records was generally accessible to all persons working under BWXTO management at the Mound Facility. On or after July 29, 1998, only supervisors or managers had access to the computer time records and then only to workers who reported to them. The purpose of limiting computer access was to inhibit whistle blowing.

261.    As stated in the September 3, 1998, reprimand, Mr. Christopher was promptly transferred to Site Transition Department where he was titled Planner, Senior. This title was later changed to Coordinator. In these capacities, Mr. Christopher's skills were under-utilized and he was over-qualified for his job.

262.    With the move to Site Transition, BWXT officials planned to terminate Mr. Christopher's employment with the first opportunity where such actions would not appear to be retaliation.

263.    Mr. Christopher's April 1999 evaluation contained an overall rating of 050 or very good; however, the average of the individual criterion scores again averaged to, approximately, 046.

264.    Mr. Christopher's last evaluation with BWXTO was on or about February 29, 2000, and he received an overall score of 060. Supervisor comments included, but were not limited to, the following: "Rick has taken on number of new responsibilities, (lease exhibits, FIMS, and sales agreements) and has transitioned some previous responsibilities to new group members. Rick's performance . . . is evaluated as excellent. Rick continues to contribute to the Site Transition team in the form of new ideas, as well as providing historical knowledge of past property disposition actions."

265.    On June 26, 2001, Mr. Christopher was terminated from his employment allegedly as part of the ISP. At the time he was fifty-five years old and had sixty-seven (67) points towards full retirement or Combo 80.

266.    Mr. Christopher's work and/or substantially similar work continued to be performed by younger and/or less experienced employees who were not Cold War Workers and/or were not Vietnam Veterans or persons who reported wrongdoing or possible wrongdoings of the general or prime contractor and/or by subcontractors. Mr. Christopher was as or more qualified than those who were not terminated.

267.    Mr. Christopher would have continued to work until the site closed; and as a consequence, he lost between $300,000 and $600,000 in lost future wages and also lost tens of thousands of dollars in retirement pay; the exact amount of which will be determined through discovery.

268.    Subsequent to the ISP, Mr. Christopher applied for various positions, including an opening as a Buyer, for which he was well qualified but was not hired. Instead younger and or less experienced persons were hired who were not Cold War Workers or Vietnam Veterans and/or persons who reported wrongdoing or possible wrongdoing.

## MARK BECKER

269.    Mark Becker is a male born on February 11, 1952. He was a graduate of Capital University, Columbus, Ohio, Magna Cum Laude.

270.    He was hired to work at the Mound Facility on or about June 26, 1989, to work as a Public Relations Specialist and reported to the communications director. Prior to the arrival of BWXTO Mr. Becker received a promotion to director of communications. He also received special education and



**BRANNON & ASSOCIATES** • 124 East Third Street, Suite 403 • Dayton, OH 45402

37

training, including, but not limited to, the leadership training institute; public participation training; informed consent building; and Covey Leadership training. He also received a number of awards.

271. Under BWXTO, Mr. Becker was The Director of Communications. In this capacity, Mr. Becker reported directly to the president of BWXTO, and was responsible for a budget of up to $1 million a year. Mr. Becker received three (3) performance reviews and merit increases in salary.

272. Mr. Becker's responsibilities at the Mound Facility were to run a comprehensive public affairs/relations program with internal and external communications efforts with emphasis and focus on the existing mission at various periods of his 12-year employment history. Internal communications included responsible for developing information all employees either via electronic or print media, or by other forms of interpersonal communications. External communications related to individuals and organizations that were not directly employed at the site including any type of public communications, public meetings, site tours, community support, government relations, press releases and government relations and external inquiries. Mr. Becker also directed goal-oriented projects as well as pre-determined objectives set forth by DOE At various times, Mr. Becker had reporting to him between one (1) and nine (9) persons either directly or through the matrix system.

273. Because of Mr. Becker's position and his duties relative to explaining to people a rationale for a course of conduct, Mr. Becker was often present during policy and/or planning meetings. Though Mr. Becker had no power or direct control over the decisions relative to policy and/or planning, he did not hesitate to voice his opinion on what should not be done or reminding Mr. Baker of his promises to workers.

274. Unlike the prior contractor, Mr. Becker was given no manuals, input, or direction regarding public affairs by BWXTO or its "so-called" parent corporation, instead, especially under Defendant Baker's management, all direction became increasingly from Jane Greenwald, Public Information Officer of DOE No objectives were established under Defendant Baker, except as ordered by DOE also would use Mr. Becker's facilities, equipment, and personnel and expected him to have resources available for their use on their demands. Mr. Becker was also required to write several site overviews for use by DOE during site tours and special events. At various times Mr. Becker was told that in reality he worked for DOE

275. Though Mr. Becker endeavored to be more accommodating to DOE under Mr. Baker's reign, he would occasionally refuse DOE demands, if the request would not fit in his budget, or otherwise improper. This refusal caused friction with local DOE personnel, especially persons in high positions.

276. In 1999, Mr. Becker put together a proposal to hire an assistant. The circumstances regarding this hiring are set forth in ¶¶ 451-460 of the Complaint discussing Carol Robinson-Burks (Hollifield) and are incorporated herein by reference as if fully rewritten.

277. As set forth therein, the assistant hired was a white female who, at all relevant times, was under the age of forty (40) years. Shortly after she was in place, Mr. Baker told Mr. Becker the new assistant would assume all Mr. Becker's duties and contact with DOE When Mr. Becker asked why he was being relieved of these DOE matters, Defendant Baker informed him that it was a "girl thing". Thereafter, all significant contact between DOE and Mr. Becker's office was handled by the new assistant and Mr. Becker was not permitted to directly participate in any decisions or meetings relative to DOE At the time, the head of local DOE, Ms. Breckbill, and also the public information officer, Ms. Greenwald, were females.



278.     In spring or summer of 2000, Mr. Becker was involved in a meeting with Defendant Baker, other top officials of BWXTO, and Jane Greenwald of DOE, regarding a plan to release 10,000 or more curies of tritium over the 1,000 curies a year then allowed and/or represented, to the public as the limit for the Mound Facility. The purpose of these significant increase releases of tritium curies was to cut cost by cutting corners of established protocols, procedures for safety and safety based restrictions. Mr. Becker was asked to put a positive spin on the release so that it could be sold to the community environmental groups and so forth.

279.     Mr. Becker told the officials that it would be difficult, if not impossible. to make such a spin and indicated that he did not want to put a spin on the purposeful release of over 1,000 curies of tritium and/or that he would not do it and/or would not violate the code of ethics. Thereafter, Mr. Becker was no longer invited to similar meetings on the release of tritium although they continued to be held. Plaintiff incorporates by reference ¶¶313-316, of the Complaint regarding Plaintiff Elias Spyrou as if fully rewritten herein.

280.     Meanwhile, approximately March 2001, an official at DOE met with Mr. Becker and told him that he did not have enough money projected in his budget; however, during the same timeframe the BWXTO official was telling him not to expand his budget.

281.     One of the other few exceptions to contact with local DOE following the hiring of his new assistant occurred on or about March 19, 2001, with Ms. Greenwald claimed that Plaintiff James England had acted inappropriately at a function and must be disciplined. Mr. Becker investigated the matter and found that Mr. England did nothing wrong, but that the actions in question occurred by another person who was employed by a news media company and that Mr. England was incorrectly identified.

282.     Mr. Becker informed Ms. Greenwald of his findings and offered to show her the proof of his findings. Ms. Greenwald refused to look at and/or consider this evidence, but continued to insist that Mr. England be disciplined. Mr. Becker refused. After this incident, Ms. Greenwald and/or DOE insisted that Mr. Becker also be discharged pursuant to the ISP and not be rehired.

283.     Plaintiffs incorporated by reference, ¶¶ 339-348, of the Complaint regarding Mr. England as if fully incorporated herein.

284.     On or about June 4, 2001, Mr. Becker was told that he would no longer be reporting to Defendant Baker, but would, henceforth, be reporting to a secunded employee, Tim Wegner.

285.     The work performed by Mr. Becker was required by DOE rules, regulations, protocols and/or procedures. Further, on or about August 1996 Mr. Becker submitted his application for VSP plan being operated by EG&G, who was then the managing company of the Mound Facility, but application was turned down because D.O.E considered him a critical employee. Mr. Becker's work had not substantially changed since then.

286.     Mr. Becker also relied on this representation and turned down either job offers and/or ceased negotiations with other companies for employment.

287.     Mr. Becker had been planning to take a vacation during the last weeks of June 2001. When Mr. Becker learned that the ISP was occurring during the time of his vacation he sought to change his



278.    In spring or summer of 2000, Mr. Becker was involved in a meeting with Defendant Baker, other top officials of BWXTO, and Jane Greenwald of DOE, regarding a plan to release 10,000 or more curies of tritium over the 1,000 curies a year then allowed and/or represented, to the public as the limit for the Mound Facility. The purpose of these significant increase releases of tritium curies was to cut cost by cutting corners of established protocols, procedures for safety and safety based restrictions. Mr. Becker was asked to put a positive spin on the release so that it could be sold to the community environmental groups and so forth.

279.    Mr. Becker told the officials that it would be difficult,·if not impossible. to make such a spin and indicated that he did not want to put a spin on the purposeful release of over 1,000 curies of tritium and/or that he would not do it and/or would not violate the code of ethics. Thereafter, Mr. Becker was no longer invited to similar meetings on the release of tritium although they continued to be held. Plaintiff incorporates by reference ¶¶313-316, of the Complaint regarding Plaintiff Elias Spyrou as if fully rewritten herein.

280.    Meanwhile, approximately March 2001, an official at DOE met with Mr. Becker and told him that he did not have enough money projected in his budget; however, during the same timeframe the BWXTO official was telling him not to expand his budget.

281.    One of the other few exceptions to contact with local DOE following the hiring of his new assistant occurred on or about March 19, 2001, with Ms. Greenwald claimed that Plaintiff James England had acted inappropriately at a function and must be disciplined. Mr. Becker investigated the matter and found that Mr. England did nothing wrong, but that the actions in question occurred by another person who was employed by a news media company and that Mr. England was incorrectly identified.

282.    Mr. Becker informed Ms. Greenwald of his findings and offered to show her the proof of his findings. Ms. Greenwald refused to look at and/or consider this evidence, but continued to insist that Mr. England be disciplined. Mr. Becker refused. After this incident, Ms. Greenwald and/or DOE insisted that Mr. Becker also be discharged pursuant to the ISP and not be rehired.

283.    Plaintiffs incorporated by reference, ¶¶ 339-348, of the Complaint regarding Mr. England as if fully incorporated herein.

284.    On or about June 4, 2001, Mr. Becker was told that he would no longer be reporting to Defendant Baker, but would, henceforth, be reporting to a secunded employee, Tim Wegner.

285.    The work performed by Mr. Becker was required by DOE rules, regulations, protocols and/or procedures. Further, on or about August 1996 Mr. Becker submitted his application for VSP plan being operated by EG&G, who was then the managing company of the Mound Facility, but application was turned down because D.O.E considered him a critical employee. Mr. Becker's work had not substantially changed since then.

286.    Mr. Becker also relied on this representation and turned down either job offers and/or ceased negotiations with other companies for employment.

287.    Mr. Becker had been planning to take a vacation during the last weeks of June 2001. When Mr. Becker learned that the ISP was occurring during the time of his vacation he sought to change his



**BRANNON & ASSOCIATES** • 124 East Third Street, Suite 403 • Dayton, OH 45402